IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION


KENDRICK C. STORY                                                                    PLAINTIFF

            v.                          Civil No. 1:07-cv-01062

PAUL LUCAS, Sheriff, Ouachita
County; LT. JOE STRICKLAND,
Chief Deputy, Ouachita County Sheriff's
Office; DAVID NORWOOD, Captain,
Ouachita County Sheriff's Office; and
CHRIS GILL, Deputy, Ouachita
County Sheriff's Office                                                              DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

        Kendrick C. Story (hereinafter Story) filed this civil rights action pursuant to 42 U.S.C. §

1983. Story contends his constitutional rights were violated while he was incarcerated at the

Ouachita County Detention Center in Camden, Arkansas. Specifically, he contends his rights were

violated when excessive force was used against him by Captain David Norwood. Further, he

maintains Deputy Chris Gill, although present at the time, did nothing to prevent the use of excessive

force. Finally, Story denies he was provided with necessary medical care for the injuries he sustained

from the use of force. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2007), the

Honorable Harry F. Barnes, United States District Judge, referred this case to the undersigned for the

purpose of making a report and recommendation.

        Defendants filed a Motion for Summary Judgment (Doc. 47). Story filed a response to the

motion (Doc. 50). Defendants filed a reply brief (Doc. 54). The motion is now before me for

issuance of this report and recommendation.

-1-

# I. Background

Story was incarcerated at the Ouachita County Detention Center (OCDC) from November of 2006 until June 13, 2007. Doc. 52 at ¶ 1. He was convicted of theft of property as a habitual offender on May 1, 2007. *Id.* at ¶ 2. He was transferred to the Arkansas Department of Correction (ADC) on June 13, 2007. *Id.* at ¶ 1.

Captain David Norwood (hereinafter Norwood) is the jail administrator. *Defendants' Exhibit 2 Norwood Deposition* (hereinafter *Defts' Ex.*)(Doc. 45-5) at page 7.[1] On May 22, 2007, Deputy Chris Gill (hereinafter Gill) contacted Norwood and informed him that the inmates in the pod Story was assigned to had been breaking some of the lights, turning over the water jug, and engaging in other forms of vandalism and causing a disruption. Doc. 52 at ¶ 3. When Norwood entered the pod, he ordered everyone, including Story, to get on the wall. *Id.*

Story testified inmates at the back of the jail were busting out lights and throwing milk jugs. *Plff's Ex. 3 Story Depo.* at pages 20 & 55-56. Story testified that Gill saw the individuals who were participating in the disruption. *Id.* at page 54. Gill then went downstairs and got Norwood. *Id.* Story asserts he did not say anything to the inmates involved in the disturbance. *Id.* at page 56.

Story was standing in the day-room of the pod designated 3-front when Norwood and Gill came upstairs to the jail. *Plff's Ex. 3 Story Depo.* at pages10, 16 & 51. Norwood had Gill open the door to pod 3-front. *Id.* at page 52. When he came in Norwood, used profanity and told the inmates to "catch the wall." *Id.* at 10 & 52. To get to the wall, Story testified he had to try to cut between Norwood and a table. *Id.* at pages 10-11.

---

[1] The deposition of Captain Norwood was taken in connection with a separate case *Hicks v. Norwood, et al.,* Civil No. 1:06-cv-01086.

Story indicates he was watching Norwood out of the corner of his eye because he knew what kind of person Norwood was. *Plff's Ex.* 3 *Story Depo.* at page 11. Specifically, Story testified Norwood was aggressive and had assaulted other people. *Id.* at page 16. Story indicated he had seen Norwood slap the Sheriff's nephew who was an inmate at the time. *Id.* at page 17. Story also knew Norwood had jumped on Ray Brewer, a fellow inmate, and almost broke Brewer's finger by bending it backwards. *Id.*

The day of the incident, Story testified he covered his head up with his arms. *Plff's Ex.* 3 *Story Depo.* at page 11. As Story attempted to go around the table, he testified Norwood struck him across the left forearm. *Plff's Ex.* 3 *Story Depo.* at page 11. At the time, Norwood was cursing and calling Story names. *Id.* at page 22.

As Story tried to "go on and get away from him," Story testified Norwood was "standing over me, steady swinging downward." *Id.* Story was hit on the left shoulder and the last two strikes were to the center and lower part of Story's back. *Id.* at pages 11, 21 & 52. When Story turned around to ask why Norwood was hitting him, Story asserts Norwood pulled out his Taser gun and had it in Story's face. *Id.* at pages 11, 21 & 52. Norwood then asked if Story was "mad to buck." Story testified this was a slang phrase meaning "if you're mad to do something about it." *Id.* at page 12. The whole incident lasted just a matter of a few seconds. *Id.* at page 28. Neither Sheriff Lucas or Lt. Joe Strickland (hereinafter Strickland) were present when the incident occurred. *Id.* at page 29.

A few minutes later, Story told Norwood he needed to go to the hospital because his arm was swollen and his shoulder and back bruised up. *Plff's Ex.* 3 *Story Depo.* at page 12. After sitting on second floor on a bench for about an hour, Story was taken to Strickland's office and asked to sign a witness statement denying any involvement in the disturbance and stating that some other inmates

had done it.  *Id.* at pages 13.  Story asserts he replied that he didn't have anything to say about it.  *Id.* at pages 13 & 53-54.  Story also maintains he told Strickland that Norwood had hit him.  *Id.* at page 53.  Approximately thirty or forty minutes later, Strickland took Story to the hospital.  *Id.* at page 13.

As soon as they entered the hospital room, Story indicates Strickland made the statement that they had another inmate who had a run in with Norwood.  *Plff's Ex.* 3 *Story Depo.* at pages 13 & 65.  Story testified he asked the nurses to take pictures of his injuries but they said they didn't have a camera for that.  *Id.* at page 13.  He also asked for the Camden Police Department to be called and the request was refused.  *Id.*

Story was x-rayed but no bones were broken.  *Plff's Ex.* 3 *Story Depo.* at page 14.  Story indicates the doctor told him that he needed to see an orthopedic doctor for treatment for his back.  *Id.* at page 29.  A few days later, Story testified he went back to the  hospital because his back was bothering him "real, real bad, and my arm was still swole.'  *Id.* at page 14.  At the time, the pain from his back was going down his leg and his thighs and legs sometimes got numb making it difficult for him to walk.  *Id.* at page 34.  Story went to the doctor twice while still at the OCDC.  *Id.* at page 51.

On June 7th, Story testified he fell getting out of his bunk because his back "completely just let me down."  *Plff's Ex.* 3 *Story Depo.* at page 14.  He was taken to the  hospital, given a shot, and the recommendation was again made for him to see an orthopedic doctor.  *Id.* at page 14.

Since he has been at the ADC, Story states he has been getting treated for his back and has a restriction of no prolonged walking, stooping, standing, or crawling.  *Id.* at page 30 & 36.  His restrictions keep him from working.  *Id.* at page 32.  He had an MRI done that showed something wrong with his lower disks and also arthritis.  *Id.* at page 30.  He is scheduled to see the doctor again to get a back brace.  *Id.* at page 30.

With respect to Sheriff Lucas, Story testified his complaint was that Sheriff Lucas did not respond to grievances and just basically ignored the situation. *Plff's Ex.* 3 *Story Depo.* at page 46. Story would have liked the Sheriff to have interviewed some of the people who saw what occurred and taken corrective action against Norwood. *Id.* With respect to Strickland, Story also contends he should have done something to make sure justice was served and no one was mistreated in the jail. *Id.* at pages 46-47.

With respect to Gill, Story thinks he should have intervened and not just stood there and watched. *Plff's Ex.* 3 *Story Depo.* at page 47. Story believes Gill should have at least asked Norwood not to strike Story anymore. *Id.* Instead, Story testified Gill just pulled out his taser when Norwood pulled his. *Id.* at page 48.

Ray C. Brewer, a fellow inmate of Story's at the time, testified he was in the cell next to Story at the time of the incident and could see everything that happened. *Plaintiff's Exhibit* 1 *Brewer Deposition* (hereinafter *Plff's Ex.*) at pages 7-8. According to Brewer, inmates in the back had been loud--hollering, and screaming. *Id.* at page 10. The jail is located on the third floor of the building directly above the Sheriff's Office. *Id.* As a result of the noise, the TV was taken out. *Id.* The inmates then broke out the lights. The inmates were being noisy and Story told them to "chill out with all that noise." *Id.* at page 8. The inmates and Story started having words back and forth with Story telling them the TV was going to get taken if they didn't quiet down. *Id.*

About that time, Brewer testified that Norwood and Gill came running up there and told Story to get on the wall. *Pff's Ex.* 1 *Brewer Depo.* at pages 8-9. Story got on the wall and Norwood came in the cell with a big flashlight. *Id.* at page 9. Norwood started "cussing and swinging the light and hit Kendrick across the head--on the side of the head with it." *Id.* Norwood kept swinging but only

hit Story the one time because after that Story ducked. *Id.* at page 13. Story jumped back out of the way and was out of Brewer's sight for a period of time. They then grabbed Story, pulled him out in the hall, and took him to be locked up. *Id.* at page 9. Brewer did not see Gill touch Story. *Id.* at page 11. Gill was just standing back looking. *Id.* Brewer did not see Sheriff Lucas or Strickland. *Id.* at page 27.

Brewer testified that Norwood has a reputation for beating detainees. *Plff's Ex.* 1 *Brewer Depo.* at page 29. In fact, Brewer stated Norwood had "jumped" him and "stomped" him when he was on the floor after having passed out. *Id.* at pages 29-30 & 36. Specifically, Brewer testified that when he came to Norwood was "[s]tomping me in the chest," and saying "Get up, ain't nothing wrong with you." *Id.* at page 36. Brewer stated this incident occurred just a few months before the incident with Story. *Id.* at pages 31 & 36.

Gregory Tooks, another fellow inmate of Story's at the relevant time, testified that when Norwood came upstairs Story was against the fence or gate. *Plff's Ex.* 2 *Tooks Depo.* at pages 6 & 10. Another inmate was by the toilet causing it to flood. *Id.* at page 8. Tooks indicated Norwood just went inside the cell and started hitting Story with a flashlight. *Id.* at pages 6 & 8.

Tooks was in the pod[2] next to Story. *Plff's Ex.* 2 *Tooks Depo.* at page 8. Tooks and several other inmates were in the day-room and could see Story. According to Tooks, Norwood came into the cell and immediately hit Story with a flashlight that was about fifteen inches long and made of black metal. *Id.* at page 12 & 21. Norwood then ordered Story to get up against the wall. *Id.* at page 12. Tooks testified that Story did not approach Norwood, make any gestures, or use profanity towards Norwood. *Id.* at page 21. Story just kept telling Norwood: "I ain't do nothing." *Id.* at page

---

[2]A pod consists of several cells opening into a common day-room area. *See Plff's Ex.* 2 *Tooks Deposition* at page 8.

21. After he was struck, Tooks stated Story kept asking Norwood: "What you hit me for?" *Id.* at page 12.

Tooks testified Norwood hit Story twice that he knew of--once on his back and once on his arm. *Plff's Ex.* 2 *Tooks Depo.* at pages 12-13. Tooks was not aware of Story being hit on the head. *Id.* at page 18. Norwood was cussing Story and Gill had the taser gun pointed at him. *Id.* at page 13. The entire incident only took a matter of seconds. *Id.* at page 18.

Tooks didn't believe Sheriff Lucas or Strickland were on third floor when the incident happened. *Plff's Ex.* 2 *Tooks Depo.* at page 17. However, he didn't know for sure. *Id.*

A short time later, Story was taken for medical attention. *Plff's Ex.* 2 *Tooks Depo.* at page 13. After the incident, Tooks testified Story's arm was a little bit swollen and he kept complaining about his back. *Id.* at page 17.

Tooks also testified that Norwood would come in cussing the inmates and hitting on them. *Plff's Ex.* 2 at pages 14-15. Tooks himself did not have any physical encounters with Norwood. *Id.* at page 18. Tooks testified that on one occasion Norwood came into the jail and just slapped an inmate and told him to go to the hole. *Id.* at page 22.

Strickland testified he was the chief deputy and responsible for moral, discipline, and control of all divisions assigned to the Ouachita County Sheriff's Department. *Plff's Ex.* 5 *Strickland Depo.* at page 6. This includes responsibility for enforcing the use of force policy. *Id.* at page 7. Essentially the policy is that the amount of force used may increase depending on the reaction of the person you are trying to subdue. *Id.* at 8-9.

Strickland indicated officers assigned to the detention facility would have a taser, a flashlight, and a radio. *Plff's Ex.* 5 *Strickland Depo.* at page 10. The flashlights are department issued and are

black and approximately ten inches long made out of aluminum or some kind of alloy. *Id.* The officers don't always have the flashlight with them. *Id.* at page 11.

When he receives a grievance alleging improper conduct on the part of personnel, Strickland either investigates it or has the Chief of the Criminal Investigation Division investigate it. *Plff's Ex. 5 Strickland Depo.* at page 12. His investigations include listening to both sides and talking to any witnesses. *Id.* at page 13. When he gets all the evidence together, Strickland submits his findings to the Sheriff and a recommendation. *Id.*

In connection with the May 22nd incident, Lt. Clint Russell, the Chief of the Criminal Investigation Division, conducted the investigation in conjunction with Strickland. *Plff's Ex. 5 Strickland Depo.* at page 13. Russell could find no wrongdoing on the part of Norwood or Gill. *Id.* at page 14. Russell reported to Strickland that Story and a couple of other inmates had "pretty much destroyed the cell. . . . Broke out lights, threw trash all over the place, milk crates. Refused to comply with verbal instructions." *Id.* at page 14. Strickland did not know if Russell had taken any statements of persons incarcerated at the jail. *Id.* Strickland was informed that Gill saw Story wielding a milk carton and breaking lights. *Id.* at page 15.

According to Strickland, on May 29th Story asked to speak with him. *Plff's Ex. 5* at page 18. Strickland had Story brought to his office. *Id.* Strickland testified that Story indicated he wanted to do away with all the "stuff about Captain Norwood beating him up" all he wanted in response was to be let "out of jail for a few weeks so that he could see his ailing mother." *Id.*

Gill testified there is only one jailer on duty at a time. *Defs' Ex. 6 Gill Dep.* at page 9. The jailer is usually on the second floor in the jail administrative office. *Id.* He keeps surveillance on the

third floor by the use of cameras. *Id.* However, there are areas where the cameras don't cover. *Id.* at page 12.

He recalls the incident involving Story but not the exact date or time. *Defts' Ex.* 6 *Gill Dep.* at page 9. He heard loud banging from the third floor, 3-front. *Id.* At this time, Gill testified he could not see any movement of the inmates in 3-front by using the surveillance cameras. *Id.* at page 13. He indicated if it was dark because the lights were off or knocked out he couldn't see into the pod. *Id.* at page 11. Additionally, inmates could stay out of the view of the camera by going further into their cells. *Id.* at pages 12-13.

As a result, he went upstairs to the front door. *Defts' Ex.* 6 *Gill Dep.* at page 9. Story was in 3-front. *Id.* at page 11. The first thing Gill saw was Story throwing jail items across the cell and the hall--specifically the water cooler. *Id.* Gill indicates he saw Story, with his hands outside the cell, just about to bust out the light right in front of his cell with the water cooler or water jug. *Id.* at pages 15-16. He had the jug in his hands and he was "swinging fixing to bust some more lights out." *Id.* at page 17. Gill believed Story had already busted some lights out and was about to bust some more. *Id.* at page 16.

As he went inside 3-front, Gill observed that the light bulbs and light fixture had been torn down and busted. *Defts' Ex.* 6 *Gill Dep.* at page 11. He saw the trash can had been dumped over and there was trash everywhere. *Id.*

Gill went back down to the second floor to call Norwood. *Defts' Ex.* 6 *Gill Dep.* at page 15. Gill doesn't believe he spoke to Story before he went back downstairs. *Id.* at page 17. Gill indicates when Story saw Gill he put the water cooler down , went back in his cell, and was looking at Gill.

*Id.* at page 18.  Gill does not recall Story making any aggressive move towards him or using profanity towards him.  *Id.*

Gill called Norwood, because he is the jail administrator, and Gill needed advice about what to do.  *Defts' Ex. 6 Gill Dep.* at page 20.  At the time he went to get Norwood, Gill was not in any fear of imminent bodily harm.  *Id.* at page 19.

Norwood came to the third floor and Gill briefly told him what had happened.  *Defts' Ex. 6 Gill Dep.* at page 19.  Gill told Norwood that he had seen Story about to bust some lights.  *Id.* at pages 19-20.  Gill then opened the cell 3-front.  *Id.* at page 20.  Gill stood in the doorway and Norwood went inside.  *Id.*

When Norwood got up to the third floor, all the banging or screaming stopped.  *Defts' Ex. 6 Gill Dep.* at page 21.  The inmates in 3-front were quiet just standing and looking at Gill and Norwood.  *Id.* at page 22.

When Norwood went into the cell, he ordered every inmate in 3-front to get on the wall.  *Defts' Ex. 6 Gill Dep.* at page 22.  They were trying to protect themselves by ordering the inmates to the wall.  *Id.*  Once everyone was on the wall, they could talk about what happened.  *Id.*

According to Gill, all inmates but Story got on the wall.  *Defts' Ex. 6 Gill Dep.* at page 22.  Story was just standing out in the middle of the cell.  *Id.* at pages 22-23.  Gill did not know what the distance was between Norwood and Story when Norwood entered the cell.  *Id.* at page 23.

After Norwood entered the cell, Gill testified he was looking around at what all had been destroyed and asking the inmates what had happened.  *Defts' Ex. 6 Gill Dep.* at page 23.  Norwood ordered Story again to get on the wall.  *Id.* at page 24.  According to Gill, Story replied that they couldn't touch him and he refused to go to the wall.  *Id.*

Gill believes Story was standing by the side of the table nearest to the wall. *Defts' Ex. 6 Gill Dep.* at page 24. Norwood was standing on the other side of the table. *Id.* at page 25. However, there was enough room to get around. *Id.* Gill testified that Norwood walked around the table to get close to Story. *Id.* at page 25. Norwood then advised Story numerous times to get on the wall. *Id.* Story just stood there saying Norwood and Gill couldn't touch him and couldn't tell him what to do. *Id.* at page 26.

Gill wasn't sure if Norwood had a flashlight with him at this point. *Defts' Ex. 6 Gill Dep.* at page 25. Gill did not have a flashlight. *Id.* at page 26. However, it was dark in the cell because the lights were out. *Id.* at page 25. Dark enough that they couldn't see what they were doing. *Id.* Gill indicated there was some light and they could determine faces and features. *Id.* at page 26.

Gill could not recall Story making any moves towards Norwood. *Defts' Ex. 6 Gill Dep.* at page 27. Story cursed them. *Id.* at page 27. He denied any involvement in the disturbance. *Id.* at page 28. When Story would not get on the wall, Norwood pushed him to get him to go to the wall. *Id.* at page 27. Even after being pushed to the wall, Gill testified Story at times still would not stay against the wall. *Id.* at page 28.

Gill pulled out his taser and was standing at the door of the cell. *Defts' Ex. 6 Gill Dep.* at page 28. He remained at the cell door at all times. *Id.* Gill indicated that is how they were trained. *Id.* One officer went in and the other officer stays by the door. *Id.*

In Gill's opinion Story complained a lot generally. *Defts' Ex. 6 Gill Dep.* at page 29. Gill testified Story "always complained about going to the hospital." *Id.* If Gill has observed any injuries on Story on May 22nd, Gill testified he would have put that in his report. *Id.* at page 30.

Gill testified it would not be in keeping with the use of force policy for an officer to strike an inmate who was not being aggressive. *Defts' Ex.* 6 *Gill Dep.* at page 36. If he witnessed any improper conduct by an officer, Gill stated he would report it to his immediate supervisor, Norwood. *Id.* at page 37. If he saw Norwood engage in improper conduct, Gill indicated he would report it to Strickland. *Id.* Gill testified he had not on any occasion seen Norwood strike an inmate with a flashlight. *Id.* at page 40.

Dr. Stephen Tabe testified he is an emergency room doctor at Ouachita County Medical Center and was working in that capacity in May of 2007. *Defts' Ex.* 1 *Tabe Depo.* at pages 4-5. He had no recollection of Story other than what is set forth in the medical records. *Id.*

Dr. Tabe indicated he was the emergency room doctor who saw Story on May 22nd. *Defts' Ex.* 1 *Tabe Depo.* at page 5. Dr. Tabe testified it was his practice to review the nurse's assessment of the patient and then to take in account, and record in his medical notes, the complaints voiced by patients. *Id.* at pages 6-7.

According to Dr. Tabe, the records from the May 22nd visit indicate Story told the nurse he had been hit on the left forearm and shoulder with a flashlight. *Defts' Ex.* 1 *Tabe Depo.* at page 7. Story's vital signs were within normal limits. *Id.* at page 8. Dr. Tabe indicated Story "presented with complaint of left elbow and shoulder pain. That's it." *Id.* On the physical examination, Dr. Tabe noted the left elbow was painful to palpation but range of motion was intact. *Id.* The range of motion on the shoulder was intact. *Id.* at page 11.

There were no other positive physical findings on his examination. *Defts' Ex.* 1 *Tabe Depo.* at page 10. Dr. Tabe ordered an x-ray of Story's elbow and shoulder. *Id.* at pages 10-11. The x-rays were all negative. *Id.* at page 11.

There were "[n]o focal neurological deficits." *Defts' Ex.* 1 *Tabe Depo.* at page 8. There are no notes from either Dr. Tabe or the nurse about Story voicing complaints of back pain or being struck in the back. *Id.* However, Dr. Tabe testified that in his experience, "most folks . . . never complain about any problem until the following day." *Id.*

Dr. Tabe indicated palpation was when you "hold it down and press it." *Id.* at page 9. The patient then responds by indicating whether it hurt. *Id.* Dr. Tabe diagnosed a left elbow contusion, prescribed Advil, and told Story to follow-up with his regular doctor. *Defts' Ex.* 1 *Tabe Depo.* at pages 12 & 25.

According to Dr. Tabe, "[a] contusion is based mostly on [the] chief complaint." *Defts' Ex.* 1 *Tabe Depo.* at page 25. It is not based on anything he saw. *Id.* Dr. Tabe did not observe any redness or swelling. *Id.*

Dr. Tabe next saw Story on June 4, 2007. *Defts' Ex.* 1 *Tabe Depo.* at page 13. When Story came in, the nurse's notes indicate he complained that he was hit in the mid to lower back with a flashlight on May 22nd. *Id.* at page 14. Dr. Tabe's notes indicate Story presented with back and left elbow pain. *Id.* Dr. Tabe indicated that Story was alert, oriented, his lungs were clear and he had no focal deficit. *Id.* Story walked without difficulty and his grip strength was equal. *Id.* Dr. Tabe did not palpate Story's back for muscle spasms or do a straight raising test because all the other signs were negative. *Id.* at page 26.

Based on his examination, Dr. Tabe concluded Story did not warrant further testing in the emergency room. *Defts' Ex.* 1 *Tabe Depo.* at page 14. Story was prescribed Ibuprofen and told to follow-up with an orthopedic doctor by making an appointment. *Id.* at pages 15-17. Dr. Tabe made this recommendation because Story could have a disk problem. *Id.* at page 16. Dr. Tabe does not

do MRI's in the emergency room unless the patient has a focal deficit. *Id.* If Story had needed to see an orthopedic doctor immediately, Dr. Tabe testified he would do the transfer in the emergency room. *Id.*

Story was next seen by Dr. Tabe on June 7th. *Defts' Ex.* 1 *Tabe Depo.* at pages 17-18. The nurse's notes indicate: Story was complaining he had been having back pain for two weeks; He was on ibuprofen; and His vital signs looked stable. *Id.* at page 18. A note was also made that Story was having pain going down his leg. *Id.* at page 28. Dr. Tabe indicated these symptoms could come from the sciatic nerve. *Id.*

On physical examination, Dr. Tabe noted Story's grip strength was equal bilaterally, there were no focal deficits, the deep tendon reflex was okay, and he walked without difficulty. *Defts' Ex.* 1 *Tabe Depo.* at page 18. Story did not complain of his elbow hurting this time. *Id.* at page 21.

Story told Dr. Tabe that there had been no new trauma. *Defts' Ex.* 1 *Tabe Depo.* at page 18. However, there is a notation from the ambulance transfer that Story had fallen inside the detention center on that day. *Id.* at pages 19-21. If there had been focal deficit, Dr. Tabe testified it would have meant Story had a serious injury like a nerve or spinal cord injury. *Id.* at page 19.

Based on his physical examination, Dr. Tabe ordered no additional tests or treatment. *Defts' Ex.* 1 *Tabe Depo.* at page 21. Story did, however, receive a pain shot while in the emergency room. *Id.* at page 27. Dr. Tabe asked Story to continue on his Ibuprofen and recommended Story see a specialist who would be able to "make a complete diagnostic work-up like an MRI." *Id.* at pages 21-22.

Dr. Tabe was asked to look at the diagnostic impression from the MRI done on Story in September which indicated Story had early degenerative disk disease at L5-S1 and early bilateral

-14-

facet atrophy at L4-L5. *Defts' Ex.* 1 *Tabe Depo.* at pages 30-31. Dr. Tabe testified both conditions were mostly arthritis. *Id.*

The MRI was done on September 27, 2007. *Defts' Ex.* 1 *Tabe Depo.* at page 29. Dr. Tabe noted that it appeared Story's condition had worsened between June and September. *Id.* at page 32. Dr. Tabe mentioned Story had presented with new complaints including his leg going numb. *Id.* at page 32.

Story was transferred to the ADC's Diagnostic Hospital shortly after his June 7th visit. (Doc. 52) at ¶ 21. On June 13th, Story was given a full physical examination and scored "MI" (the best possible score) for excellent physical condition. (Doc. 52) at ¶ 22 & *Defts' Ex.* 4.

Dr. Robert Scott testified he treated Story at the Varner Unit of the ADC. *Plff's Ex.* 4 *Scott Depo.* at page 6. Dr. Scott vaguely recalled hearing the story of Story's altercation and pain. *Id.* His first encounter with Story was on September 6, 2007. *Id.* at page 7. Story complained of severe pain in the lower part of the back. *Id.* at page 8. He indicated he had spasms going down his right leg to just below the knee. *Id.* Story stated that he had been jumped on by the police in May and his problems had started then. *Id.*

Dr. Scott testified that he did a targeted examination on his patients based on the complaint at the time of presentation. *Plff's Ex.* 4 *Scott Depo.* at page 10. From the physical examination, Dr. Scott concluded that Story "did not have a significant neurologic injury at that time." However, Dr. Scott said that "doesn't mean he might not have some irritation or something, you know, accounting for his pain. It just says that, basically, there's nothing to suggest he's an operative candidate at this point in time." *Id.* at page 12. Dr. Scott noted Story had "sciatic stretch pain on the right, and that-- the sciatic nerve runs near the soleus muscles in the back, and when you stretch those muscles by

extending the leg in a sitting position, it will irritate the nerve if it's irritable." *Id.* at page 12. Additionally, Dr. Scott noted on palpation, Story had "marked pain over the lumbar musculature, in other words, the musculature of the lower back on the right, as well as tenderness over the lumber spinous processes." *Id.* at page 13. The findings were consistent with sciatica or irritation of the sciatic nerve, which may come from degenerative disk disease or irritation of the nerve from other causes." *Id.* at page 23.

The plan at that point was to prescribe a muscle relaxer, Methycarbomal, to relieve the spasms and ibuprofen as an anti-inflammatory. *Plff's Ex.* 4 *Scott Depo.* at 16. The medications were for ten days. *Id.* at page 18. Dr. Scott also put some restrictions on Story's physical activity. *Id.*

Dr. Scott next saw Story on September 11th. *Plff's Ex.* 4 *Scott Depo.* at page 18. At this visit, Dr. Scott noted that Story reported having been struck across the back during an altercation with the police. *Id.* Dr. Scott testified that at the first visit Story didn't say he had been struck across the back but just said he had been jumped on. *Id.*

Dr. Scott's physical examination was unchanged from the prior examination. *Plff's Ex.* 4 *Scott Depo.* at 19. Story still had sciatic stretch pain. *Id.* at page 29. He felt that Story's condition was worsening and he was not responding as one would have expected. *Id.* at page 27. For this reason, Dr. Scott ordered an MRI. *Id.* at page 19. The restrictions on Story's physical activities were continued. *Id.* at page 29.

During neither visit did Story complain of injury to his shoulder, head or arms. *Plff's Ex.* 4 *Scott Depo.* at page 36. Further, Dr. Scott did not find any evidence of injuries to Story's shoulder, head, or arms. *Id.*

As Story was in the ADC, the order for an MRI also had to be approved by Dr. Anderson in Pine Bluff. *Plff's Ex.* 4 *Scott Depo.* at page 20. Dr. Scott never saw the report of an MRI. *Id.* However, one was apparently taken because Dr. Scott saw the results of the MRI for the first time during his deposition. *Id.*

The MRI showed early degenerative disk disease at L5-S1 and early bilateral facet joint arthropathy. *Plff's Ex.* 4 *Scott Depo.* at page 21. Dr. Scott testified that neither of those diagnoses are consistent with an acute or sudden impact event. *Id. See also* page 22 ("The history relative from the trauma would not be consistent with the MRI findings of degenerative disk disease."). Both are chronic ongoing conditions unrelated to trauma. *Id.* at page 38. While sciatica can occur without degenerative disk disease, Dr. Scott testified it would be a "rare bird." *Id.* at page 24. Moreover, Dr. Scott testified that there was no finding on the "MRI to support the diagnosis of--or presumed diagnosis of sciatica." *Id.* at page 29. There were "no bulging disks, no physical findings of impingement on the nerve which would result in sciatica." *Id.*

Dr. Scott stated these findings didn't mean Story didn't have sciatica--only that there was nothing to surgically correct. *Id.* at page 29 & 39. In Dr. Scott's opinion Story would recover with conservative therapy. *Id.*

However, Dr. Scott testified that trauma could aggravate the symptoms of degenerative disk disease. *Plff's Ex.* 4 *Scott Depo.* at page 25. While it was possible for the symptoms to be aggravated by being struck with an instrument such as a flashlight on the back, Dr. Scott said he "would have a hard time going for it." *Id.* at page 26. He pointed out the nerves and structures are very deep in the musculature. *Id.* It was far more plausible for someone who had been in an altercation or jumped on, to exhibit symptoms because of the aggravation. *Id.* at page 25-26.

Dr. Scott testified that the majority of the time the symptoms caused by an aggravation of degenerative disk disease last ten days to two weeks. *Plff's Ex.* 4 *Scott Depo.* at page 26. However, the symptoms can last a month or six weeks. *Id.*

Dr. Scott was asked to review notes taken at a nurse's visit on June 22nd. *Plff's Ex.* 4 *Scott Depo.* at page 32. He indicated the symptoms Story was reporting would be consistent with an aggravation of degenerative disk disease. *Id.* Next, Dr. Scott reviewed nurse's notes from a June 27th encounter. *Id.* At the time, Story was complaining of pain starting in the groin area. *Id.* Dr. Scott indicated these symptoms were not consistent with degenerative disk disease. *Id.* He testified he had never seen "anyone with sciatica complain of groin pain." *Id.* at 33. The findings from an August 14th visit, Dr. Scott testified would not be unreasonable with someone with degenerative disk disease. *Id.* at page 34. On September 21st, Story, complaining of back pain, was seen by a nurse. *Id.* The nurse noted that during the exam there were exaggerated movements. *Id.* Dr. Scott testified this was an "inside shorthand" way to say she thought his reactions were out of proportion to what one would expect. *Id.*

Dr. Scott was also asked to look at the written notes made by Dr. Jonak when he saw Story on October 9th. *Plff's Ex.* 4 at page 34. He testified that Dr. Jonak's finding were consistent with an aggravation of degenerative disk disease. *Id.* Dr. Scott also stated that the restrictions placed on Story by Dr. Jonak, no prolonged crawling, stooping, running, jumping, walking and standing, were reasonable restrictions. *Id.* at pages 34-35.

## II. Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475

U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a . . . verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III.  The Arguments of the Parties

First, Defendants concede that both Norwood and Story present diametrically opposed versions of the events of May 22nd which is corroborated, at least in part, by their respective witnesses.  Defendants argue this case is "different from the normal "he said, she said" excessive force claim and calls for a grant of qualified immunity and summary judgment to the Defendants because, despite Plaintiff's sworn testimony about Defendant Norwood's brutal assault upon his person with a long metal flashlight, direct medical evidence shows that Plaintiff suffered no objective injury from the alleged assault. *Defendants' Brief* (Doc. 48) at page 2.  Defendants maintain the lack of injury is fatal to Plaintiff's claim both under the Eighth Amendment and the provisions of the Prison Litigation Reform Act.

Second, Defendants maintain Gill is entitled to summary judgment on the failure to protect claim. They argue Plaintiff cannot show that: (1) Norwood posed a substantial risk of serious harm to Plaintiff before the attack; or (2) Gill actually knew of but disregarded, or was deliberately indifferent to, Plaintiff's health or safety.

Third, Defendants maintain there is no evidence that they denied Plaintiff access to adequate medical care after Norwood allegedly subjected him to excessive force. They point out Plaintiff was examined three times by a physician within the two weeks following the alleged injury.

Finally, Defendants maintain Sheriff Lucas and Chief Deputy Joe Strickland are entitled to judgment as a matter of law because there is no proof of any personal involvement by either of them in the incident at issue in this case. They further argue Plaintiff has failed to allege an unconstitutional county policy which was the moving force behind the alleged constitutional violations.

Plaintiff maintains there is a genuine issue of material fact as to whether Norwood used excessive force against him. He maintains that his deposition and that of Brewer, Tooks, Dr. Scott, and Strickland support his claims. He also maintains that the following documents from the case of *Hicks v. Norwood, et al.,* Civil No. 1:06-cv-01086, support his claims: the deposition of David Norwood; the affidavit of Eddie Bunn, and excerpts from the deposition of Lt. Gregory. As a result of the use of excessive force, Plaintiff argues he began to have pain and muscle spasms in his back and numbness and pain in his right leg.

Next, Plaintiff maintains there are genuine issues of material fact as to whether Gill violated Story's constitutional rights when Gill failed to intervene when he witnessed Norwood's application

of physical force. Plaintiff asserts that Gill pointed his taser at the Plaintiff while Norwood engaged in the unprovoked attack.

Finally, Plaintiff concedes that he was not denied medical treatment. He also concedes there is no basis of liability for Strickland.

## IV. Discussion

As noted above, Defendants have moved for summary judgment on each of Story's claims. I will discuss each claim in turn.

### *Excessive Force*

On May 22nd Story was in convicted status. *Resp.* (Doc. 52) at ¶ 2. "[T]he Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences." *Wilson v. Spain*, 209 F.3d 713 (8th Cir. 2000)(*citing Whitley v. Albers*, 475 U.S. 312, 318-322, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)). "The Eighth Amendment protects inmates from the unnecessary and wanton infliction of pain by correctional officers regardless of whether an inmate suffers serious injury as a result." *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002)(citations omitted). The Supreme Court has held that when "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (*quoting Hudson*, 503 U.S. at 6-7). To make this determination, the court is to consider, among other things, the following factors: "the need for the application of

physical force; the relationship between the need for physical force and the amount of force applied; and the extent of injury suffered by the inmate." *Jones*, 207 F.3d at 495 (citations omitted).

"[F]orce that is excessive within the meaning of the Eighth Amendment is compensable if it causes the prisoner actual injury, even if the injury is not of great significance." *Howard v. Barnett*, 21 F.3d 868, 873 (8th Cir. 1994). The Court has recognized that "it is possible for a use of force to be excessive and in violation of the Eighth Amendment, and yet result in injury having no or only monetary value." *Foulk v. Charrier*, 262 F.3d 687, 701 (8th Cir. 2001).

Story contends he was struck four times with a long metal flashlight while he was attempting to comply with the order to get to the wall. Other inmates who witnessed the encounter between Story corroborated, in part, Story's recollection of the event. Although the inmates gave slightly different version of what occurred than Story did, there was agreement on the fact that Norwood struck Story when there was no indication of aggression on Story's part. As a result of the altercation with Norwood, Story asserts his arm was swollen, his shoulder was bruised, and he had pain in his back. Story was seen to the emergency room the day of the incident and two other times within a couple of weeks of the incident. On the first visit, Dr. Tabe noted Story's elbow was painful on palpation and diagnosed Story as having a contusion on his elbow. No other scrapes, bruises, lacerations or redness were noted. During the two subsequent visits with Dr. Tabe, Story was complaining of back pain. While I tend to agree with Defendants that the extent of the injury noted on May 22nd does not appear to be extensive as one would expect after a vicious assault with a long metal flashlight, I believe there is sufficient evidence of injury under the Eighth Amendment. *See Foulk v. Charrier*, 262 F.3d 687, 701 (8th Cir. 2001)("An injury warranting nominal damages is not necessarily the result of a *de minimis* use of force. Stated differently, it is possible for a use of force

to be excessive and in violation of the Eighth Amendment, and yet result in injury having no or only nominal monetary value."); *Howard v. Barnett*, 21 F.3d 868, 873 (8th Cir. 1994)("force that is excessive within the meaning of the Eighth Amendment is compensable if it causes the prisoner actual injury, even if the injury is not of great significance." ). This evidence of injury also satisfies the physical injury requirement of the Prison Litigation Reform Act. *See e.g., Oliver v. Keller,* 289 F.3d 623, 627 (9th Cir. 2002)("for all claims to which it applies, 42 U.S.C. § 1997e(e) requires a prior showing of physical injury that need not be significant but must be more than *de minimis.*").

Defendants maintain that when Story refused to comply with Norwood's command to get to the wall, he pushed Story against the wall. In support, Defendants cite to Norwood's deposition at pages 18 and 19. As noted above, Norwood's deposition, submitted by both sides, was taken in the *Hicks v. Norwood*, Civil No. 1:06-cv-01086. The pages cited by Defendants are a discussion of an encounter Norwood had with Hicks. Viewing the evidence in the light most favorable to Story, I cannot at the summary judgment stage merely choose to believe the Defendants' version of the events of May 22nd and disbelieve Story's version of the events. I find there are genuine issues of material fact as to whether Norwood used excessive force against Story.

### *Qualified Immunity*

"Qualified immunity is a defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Carroll v. Pfeffer*, 262 F.3d 847, 849 (8th Cir. 2001)(*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 112 S. Ct. 534, 537, 116 L.

Ed. 2d 589 (1991)(*quoting, Malley v. Briggs*, 475 U.S. 335, 343, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). The inquiry is normally one of pure law. *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir. 1989).

The issue of whether a state actor is entitled to the protection of qualified immunity is a two-step process. *See Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001); *Washington v. Normandy Fire Protection Dist.*, 272 F.3d 522, 526 (8th Cir. 2001) . First, the court must ask whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Second, the court must determine if the right was clearly established. *See Washington*, 272 F.3d at 256.

In *Pearson v. Callahan,* --- U.S. ----, 129 S. Ct. 808, 815-16, 172 L. Ed. 2d 565 (2009) the Supreme Court held that "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory," and courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *See Nelson v. Correctional Medical Services*, 583 F.3d 522 (2009).

Here, as discussed above, viewed in the light most favorable to Story, the evidence does not show an objective need for the force that was used. At the time force was used, Story was not jeopardizing any person's safety or threatening prison security. *See Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002). I believe there is a basis for Eighth Amendment liability.

In order to overcome the claims of qualified immunity, Story must also show that his constitutional rights were clearly established. A right is clearly established if its contours are

sufficiently clear that a reasonable official would have fair warning of the type of action that would violate that right.

It is "well established that a malicious and sadistic use of force by a prison official against a prisoner, done with the intent to injure and causing actual injury, is enough to establish a violation of the Eighth Amendment's cruel and unusual punishment clause." *Foulk v. Charrier*, 262 F.3d 687, 702 (8th Cir. 2001). "It is also clearly established that force may be justified to make an inmate comply with a lawful prison regulation or order, but only if the inmate's noncompliance also poses a threat to other persons or to prison security". *Treats*, 308 F.3d at 875 (citations omitted). When force was applied to Story, "the law was clearly established that correctional officers do not have a blank check to use force whenever a prisoner is being difficult." *Id.*

As discussed above, there is a factual dispute as to the conduct of Norwood. I cannot at the summary judgment stage, resolve factual disputes in Norwood's favor or make credibility determinations. *See e.g., Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir. 2001)("arguments asserting qualified immunity rest largely on ignoring disputed facts in the record and asking this court to resolve factual disputes in [defendant's] favor.").

### *Failure to Intervene*

A detention officer may be liable for failure to protect an inmate from a use of excessive force if the officer is deliberately indifferent to a substantial risk of serious harm to the inmate. *See e.g., Estate of Davis by Ostenfeld v. Delo*, 115 F.3d 1388, 1395 (8th Cir. 1997)(*citing Buckner v. Hollins*, 983 F.2d 119, 122 (8th Cir. 1993)(duty to intervene when excessive force is being used against an inmate and the inmate claims injury, or aggravation of injury, due to the officer's failure to act)). *See also Velazquez v. City of Hialeah*, 484 F.3d 1340 (11th Cir. 2007)("[A]n officer who is present

at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.")(internal quotation marks and citations omitted). In response to a summary judgment motion, the plaintiff must show some evidence upon which a trier of fact "could conclude that [the officer] acted with deliberate indifference to [the plaintiff's] safety by failing to intervene in the altercation." *Buckner*, 983 F.2d at 122.

In this case, Story testified the whole incident with Norwood lasted seconds. *Plff's Ex.* 3 *Story Depo.* at page 28. Given the short time span, the fact that there is no evidence Gill had reason to believe Norwood would be utilizing force, or any record evidence suggesting Gill even had time to intervene, I do not believe there is a genuine issue of fact as to whether Gill acted with deliberate indifference to Story's safety by failing to intervene in the altercation.

### *Governmental Liability*

To establish the liability of Ouachita County, Story has to show his constitutional rights were violated by an "action pursuant to official municipal policy" or misconduct so pervasive among non policymaking employees of the municipality "as to constitute a custom or usage with the force of law." <u>Ware v. Jackson County,</u> 150 F.3d 373, 880 (8th Cir. 1998). In this case, Story seeks to impose liability on Ouachita County because of its acquiescence in the conduct of its officers. In this regard, Story points out that Brewer knew of three instances when Norwood had allegedly used excessive force against inmates. Story argues the failure to properly investigate these incidents and what happened in his case may be viewed as ratification of the illegal acts and evidence of the official policy of Ouachita County. Story suggests Norwood engaged in a pattern of beating inmates without provocation. Story cites extensively to the case of *Hicks v. Norwood*, Civil No. 1:06-cv-0186.

I disagree. Although extensive discovery was undertaken in this case, including multiple depositions, there is no evidence in the record, with the exception of the incident involving Anthony Hicks, indicating that the alleged prior uses of force resulted in complaints being made against Norwood or that there was a failure on any of the Defendants' part to investigate such complaints. *Estate of Davis by Ostenfeld v. Delo*, 115 F.3d 1388, 1396 (8th Cir. 1997). The *Hicks* case is currently pending and there has been no determination that Norwood used excessive force against Hicks. *See Hicks v. Norwood*, Civil No. 1:06-cv-01086.

## V. Conclusion

I therefore recommend that the Motion for Summary Judgment (Doc. 47) be granted in part and denied in part. Specifically, I recommend the motion be granted as to: (1) the denial of the medical care claim; (2) the failure to protect claim; and (3) all claims against Sheriff Paul Lucas, Lt. Joe Strickland, and Deputy Chris Gill. I recommend the Motion for Summary Judgment (Doc. 47) be denied with respect to the excessive force claim asserted against Captain David Norwood.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **25th day of February 2010.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE