IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

KENDRICK C. STORY                                               PLAINTIFF

           v.                      Civil No. 1:07-cv-01062

PAUL LUCAS, Sheriff, Ouachita
County; LT. JOE STRICKLAND,
Chief Deputy, Ouachita County Sheriff's
Office; DAVID NORWOOD, Captain,
Ouachita County Sheriff's Office; and
CHRIS GILL, Deputy, Ouachita
County Sheriff's Office                                         DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Kendrick C. Story (hereinafter Story), currently an inmate in the Arkansas Department of

Correction, Randall L. Williams Correctional Facility, filed this civil rights action pursuant to 42

U.S.C. § 1983.  Story contends his constitutional rights were violated while he was incarcerated at

the Ouachita County Detention Center in Camden, Arkansas.  Specifically, he contends his rights

were violated on May 22, 2007, when excessive force was used against him by Captain David

Norwood.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2007), the Honorable Harry

F. Barnes, United States District Judge, referred this case to the undersigned for the purpose of

making a report and recommendation.

An evidentiary hearing was held on May 27, 2010.  At the conclusion of the hearing, the case

was taken under advisement.  Counsel were given a period of time to submit proposed findings of

fact and conclusions of law if they desired to do so.  The Court has received the proposed findings

and the case is now ready for decision.

-1-

## I.  Background

Story was incarcerated at the Ouachita County Detention Center (OCDC) from November of 2006 until June 13, 2007, when he was transferred to the Arkansas Department of Correction (ADC). He was convicted of theft of property as a habitual offender on May 1, 2007.

At the time relevant to the complaint, David Norwood (hereinafter Norwood) held the rank of Captain and was the jail administrator.  Norwood is currently the Sheriff of Ouachita County.

At the evidentiary hearing, the following witnesses testified:  (1) Gregory Tooks; (2) Roy Malcolm, Jr.; (3) Ray Brewer; (4) Chief Deputy Strickland; (5) Sheriff David Norwood; (6) Kendrick Story; and (7) Officer Chris Gill.  The parties also submitted the testimony of Dr. Stephen Tabe, Dr. Robert Scott, and Connie Hubbard, A.P.N. by deposition.  For purposes of discussion, the testimony of the witnesses will be summarized in the first person.

### *Gregory Tooks*

I am currently incarcerated in the ADC.  I was in the OCDC from January to June of 2007. I knew Story from jail.  Our cells were next to each other.  I was in A pod.  Story was in the 3-front area of B pod.  There was just one wall between the pods and it was a gate with bars.  To the left, there was a solid wall that extended maybe fifteen feet.  On May 22nd, I went to the front of the pod and looked down the hallway.  I could only see the front of B pod.

An inmate in 3-front put something in the toilet causing it to overflow and flood the pod. Story did not participate in flooding the pod.  I know because I could see Story and had been talking to him for an hour or so before Norwood came up.  It was daylight when this occurred but the lights were on.  I didn't see anyone breaking the lights out or any broken lights.  However, there were some

-2-

lights in Story's pod that I couldn't see.  I was standing at the gate between the pods.  Story was at the gate too at the very from of B pod.   The other inmates were being loud.  I don't know who was making the noise.  I was just talking to my cell-mates.

Gill came up to see what was going on.  He told Story to get back.

The water cooler was outside the gate to the cells.  The cooler sits sitting on a milk crate.  You put your cup out of the gate to get water.  While you could pick up the water cooler, I didn't see anyone do it.

Norwood, cussing, came up, told Story to back away from the gate and be quiet, and hit Story with a large metal flashlight.  Story just kept saying to Norwood:  "What you hit me for."  In response, Norwood hit Story again.  Norwood hit Story on the arm and back.  Norwood didn't ask any questions.  Gill had a taser and pointed it at Story.  Story was still standing by the gate.  He hadn't made any moves towards Norwood, cursed him, or threatened him.  When Norwood came to the cell, he was probably five feet from Story.  I didn't see Story with anything in his hand before Norwood came up.  If Story had gotten up against the wall I wouldn't have been able to see him.

Other inmates asked Norwood why he hit Story.  I told Norwood that Story was not involved in the flooding.  Norwood said he was coming to my cell next.  I didn't see Norwood using any other force.

After the incident, they took Story downstairs and I guess to the hospital.  It was a couple of hours before I saw him and he said he had to go to a bone specialist.  I didn't observe any injuries but he said he was in pain.

I have seen officers walking around with flashlights.  I didn't talk to anyone investigating this incident.  No one asked to take my statement.

-3-

I have been housed with Story since 2007.  We talked about this lawsuit.

**Roy Malcolm, Jr.**

I am currently in the ADC.  I was in the OCDC from August 2006 until June 2007.  I came into contact with Story.  He was in 3-front and I was in 3A.  I talked to him.  Tooks was also in A-pod.

On May 22nd, inmates were messing up the place--destroying things.  I do not recall the inmates' names but I could identify them.  I was sitting at the table looking down the hallway to see Story and Norwood.  Tooks was also looking down the hallway.

When Norwood arrived, there was a riot going on.  People in the pod were throwing things and flooding the pod.  I didn't see any busting out of the lights but I couldn't see back into the pod.  As Norwood entered 3-front, I saw him hit Story three times with a long police flashlight made out of steel.  Story was trying to get away from the flashlight.  It looked like Story was doing nothing when Norwood struck him.  He had just been talking.  After Norwood swung a couple of more times, Story got away.  He was struck in the arm and the upper and lower back.  It was a brutal attack.  I do not recall if Norwood gave Story or any of the inmates a command.  Story yelled out: "What did you hit me for."

After Story was struck, he moved out of my sight.  He acted like he was hurt.  I didn't have a chance to see his injuries.  Story was taken to the hospital.  When he came back, he came to 3-front to get his things and was then moved downstairs.  I didn't see him again until the next time we went to the yard for recreation.  I didn't have any more conversations with him at the OCDC.

-4-

I did not see anyone else struck.  No one ever came and questioned any of us.  My statement was not taken and I didn't talk with Strickland about the incident.  While I was at the Varner Unit of the ADC, Story and I were housed together for about a month.  Tooks was also at Varner.

### Ray Brewer

I was in the OCDC from March to June of 2007.  I talked to Story a couple of times.  I think I was in 3A with Tooks and Malcolm.

On May 22nd, there was a disturbance in 3-front.  The pod was being flooded, some lights were broken out, and it was noisy.  I wouldn't call it a riot. You could see but some lights were out.  You might have needed a flashlight to see in some of the cells.  It was dark on one side.  By the time I got out of my bunk part of the lights were out and there was a flood.

I didn't see who knocked the lights out.  Story didn't do it because we could see him.  He was at the front at the bar.  When Norwood came up, he yelled for everyone to get back and get on the G–D----- wall.  When Norwood said this, Story was headed towards the bar.  After Story turned to retreat, Norwood shoved Story against the bars.  I saw Norwood push Story up against the bars, really hard.  Story had been facing Norwood when he was told to get on the wall.  Story then turned sideways towards the bars at the front.  Norwood pulled out his flashlight.  Story put up his arms either to hit Norwood or to put his hands on his head.

I only saw Norwood swing his long heavy black metal flashlight at Story once.  Story had his hands up.  Story hadn't been doing anything before Norwood got there.  When he was struck, Story asked: "Why did you do that?  Why did you hit me for?"  When the inmates saw Norwood they scattered.  Story didn't block Norwood's way or make any moves toward him.  Everyone started asking why Norwood did that to Story.

-5-

Story was moved after this. I saw him a day or two later. He was walking and moving slow as if he was sore or something. I never saw Story's injuries. Story may have said a few words to me but you are not supposed to talk when you are being moved from one place to another.

No investigator ever talked to me. I was never in the same ADC unit as Story.

I used to work for Norwood as a clerk. I have no problem with him. I never saw Story causing any jailers problems.

### Chief Deputy Strickland

I was chief deputy in 2007. I was responsible for the management and operation of the Sheriff's Department. It was my responsibility to train officers in the use of force policy. Normally, there was training once a month.

Plaintiff's exhibit 1 is the use of force policy. I believe it is the policy that was in effect in May of 2007. The policy requires the officers to use the minimum amount of force necessary to get the job done. The amount of physical force that can appropriately be used escalates if an inmate is being aggressive or trying to inflict bodily harm on the officer. It would be inappropriate to use force on an inmate for just speaking to the officer, to strike an inmate not making an aggressive move, to strike an inmate attempting to comply with an order, or to strike an inmate just because of the destruction of property in the jail. Every situation is different. If an officer is being attacked, the use of a flashlight to defend himself is appropriate. I would not use a flashlight to strike an inmate.

I was called to the jail on May 22nd. The jail was flooded. There was water everywhere. Lights were broken out and the water cooler was tipped over.

Norwood, Gill, and some other officers were present. I was told Story caused part of the damage in the cell. I believe I was told he had a milk crate in his hand. I assigned Lt. Clint Russell

to investigate the incident.  He was assisted by Officer Stanton.  My investigators talked to at least six or seven inmates.  No one informed me of conduct on the part of Story that would justify officers hitting him with a flashlight.

Story complained of injuries and I personally took him to the hospital.  He may have told me Norwood struck him with a flashlight.  I don't recall seeing any injuries on Story.  I saw no swelling, bleeding, scrapes, or scratches.

Story sent in repeated grievance forms.  Plaintiff's exhibits 2 and 3 are some of the many grievance forms I received from Story.  He mentioned an assault with a flashlight.  I had him brought to my office.  I told Story he could file his lawsuit.  Story said he wouldn't pursue the case if he got an ADC bond to visit his ailing mother.  Story had a strong history of filing lawsuits or making allegations against law enforcement officials.  He had a lawsuit against Sheriff Knighton.[1]  He also told Norwood and I that he lied and he wanted to deal.

I ordered Story moved to a different cell.  It could have been for a number of reasons such as threats, injuries, or an infectious disease.  He was moved to an area of two or three man cells.  The cells are away from the general population and other inmates would have a difficult time communicating with him.  The length of time he was there would depend on the reason he is there.

### Sheriff David Norwood

I have worked for the Ouachita County Sheriff's Department for close to twenty-seven years.  In May of 2007, I was a captain.  I was responsible for the jail administration.  I oversaw the everyday operations of the jail.

---

[1] The case referenced was *Story v. Knighton, et al.,* Civil No. 1:07-cv-01032.  Judgment was entered in favor of the Plaintiff in the case on July 15, 2009.

There are cameras in parts of the jail.  During May of 2007, I am not sure if there was a camera or not.  In any event, they were not the kind that backed up to film.  We never had recording for the monitors on the third floor.  In May of 2007, the system was not working.  It seems like it was inoperable for more than a year.  The system got taken out.

The jailers use the cameras to monitor.  The jailer is on the second floor and has the responsibility of monitoring inmates on the third floor.  If the jailer was needed on the third floor, sometimes a trustee will call or the inmates bang on the wall or floor.  The monitors were in the hallways--not in the pods.

There were lights in the hallway.  The jailer would be able to see any inmate destroying lights.  The jailer on duty on May 22nd was Chris Gill.  He worked 5 a.m. to 5 p.m.  I was in the jail in the office.  I was told there was a problem in the jail.  I couldn't hear any noises from the third floor that day.

I went outside to retrieve my flashlight.  It stays in a charger in the car.  I was told the lights were out.  When I went up, there was enough light you could see without the flashlight.  It was light enough to see details such as a person's face.  You couldn't see the parts of the cells where they sleep.  You could see what was happening in the day-room area.  I had the flashlight in my right hand.  I never had to turn it on during this incident.  A person standing at the gate in 3A could see through the gate into 3-front.

The first person I came into contact with was Gill on the second floor.  I think we took the stairs to third floor.  Gill said he had already been to third floor and the inmates were trashing the place.  He said there were broken lights, water, and trash everywhere.  He didn't go into detail.  He told me enough that I knew we needed to get up there and take care of it--especially the flooding.

I caught Story in the act.  I came in the main door to pod three.  When I got there, Story was in the far right of the cell holding the plastic  milk crate in one hand, tossing it up, and trying to hit the lights.  He was not in front of the bar gate.  He was two to three feet off the metal wall that protects the wires and other things.  There was fifteen feet between Story and I.  The picnic table was between us.  When Story saw me, he stopped and let the crate fall to the floor.  The crate is what the water cooler sits on.

Story didn't advance towards me.  He was cursing but not threatening me.  When I went to the jail door, there was less than a foot between us.  I made the comment that I had seen him trying to break the light.

When the door was opened, I told the inmates to grab the wall.  I again told Story to grab the wall.  Story didn't move so I pushed him, using both hands, a few steps.  The flashlight was in my right hand.  The flashlight would have come into contact with Story's body.  I had the taser ready. Story turned away back towards me and he was walking toward the wall.  He was facing me, turned around, and was mouthing about me having touched him.  I shoved him again.  This time I pushed him very hard.

I had no problems when I pushed him to the wall.  I threatened to use the taser to make sure he stayed on the wall.  We had to get the toilet unplugged.

The policy regarding the use of force is to use the minimum amount of force necessary to control the situation.  I wouldn't use the flashlight to do bodily harm or to hurt someone for just talking.

Everyone knew about the flashlight.  I didn't swing it at him or strike him with it.  It was in my hand when I shoved him.  I also pulled the taser out.  You could hurt someone with the flashlight. It is about one and one-half inches in diameter, twelve inches long, and made of cast aluminum.

Story immediately asked for medical attention.  The flashlight is capable of causing bruising and contusions.  It could even be used to kill someone.

I was present at the meeting with Strickland.  The meeting occurred a few days after the incident.  Story said he wanted to drop his claim if he could be released.  He thought he had something to bargain with.

### Kendrick Story

I was in the OCDC for six months.  Before May 22nd, I hadn't had any problems with the jailers.

On May 22nd there was a misunderstanding with Gill.  The inmates on the second floor got yard call and the third floor didn't.  The place was being flooded and milk crates were being thrown around.  I told the inmates to chill out or the television would get taken.  I didn't participate in the flooding or other activities.

When Gill came up to the third floor, he saw things flying from every angle.  Gill looked dead at me.  He told the trustees to come out of the pod.  Approximately three minutes later, Norwood and Gill came up.

I was trying to sit the milk crate back upright and put the cooler on it.  I didn't want the water to get nasty.  I backed up to the other side of the picnic table.  I had been close to the front of the cell.

I turned and was walking away from the door when Norwood came in.  I saw out of the corner of my eye that Norwood had the flashlight drawn up.  I threw up my arms and he struck my left

-10-

forearm in the elbow area.  He hit me hard enough to hurt and cause damage and swelling in the arm.

Norwood hit me four times: on the left elbow; the top part of the left shoulder; the middle part of my

back; and the upper part of my back.  There was no pushing involved.  I asked why he hit me.  He

drew his taser.

My arm was throbbing.  I told them I needed to go to the hospital.  I made sure to tell the

others I was leaving.  They chained me up and then made me wait thirty-five minutes or so.

Strickland tried to get me to write a statement about the incident.  Strickland said he didn't

believe I had been struck.  He told me to file a lawsuit if I wanted.  He took me to the hospital.  When

we got there, Strickland told the nurses that he had another one who had a run-in with Norwood.

The doctor never took off my clothes to examine my body.  I was sitting in the hospital room

with a jumpsuit on and I was handcuffed.  I told the doctor where my injuries were and asked to have

pictures made.  My left forearm and the top part of my left shoulder were swollen.  I was told they

didn't have a camera in the hospital.  I was diagnosed with a left elbow contusion.  *Plaintiff's Exhibit*

(hereinafter *Plff's Ex.*) 4.  I was taken back to the emergency department on June 4th and June 7th.

*Id.*  I was having pain in my lower and middle back.  I was given an injection.

At the ADC, it took three months before I could get the doctor to prescribe an MRI.  It

showed I had degenerative disc disease and arthritis in my back.  I had to go through their protocol

and once I had done that, they saw something was actually wrong and I was given restrictions on my

activities and no work.

### Officer Chris Gill

I work for the Ouachita County Sheriff's Department.  I was a jailer on May 22, 2007.

I was in the jail office on the second floor and I heard a lot of banging and yelling.  I went to the third floor and saw Story swinging a water jug and attempting to break the lights out.  I did not see Story actually destroying property.  Norwood ordered me to open the door.  Before I opened the door, Norwood gave an order for the inmates to get on the wall.  Norwood went into the cell.  He was met by Story.  Story refused to go to the wall and Norwood pushed him to it.  Norwood had his flashlight in his hand when he pushed Story.  Norwood drew his taser and demanded Story stay on the wall while we pulled a jumpsuit out of the toilet.  We then escorted Story to the second floor, put him on a bench, and placed leg irons on him.  I never saw Norwood strike Story.

Following the incident, I did a report.  I did not mention that Norwood had a flashlight in his hand.  The incident report is used to let the supervisor know about any use of physical force.  I concluded that the flashlight was not involved in the use of force.

### Dr. Robert Scott (by Deposition)

I treated Story at the Varner Unit of the ADC.  *Plff's Ex.* 7 at page 6.  I vaguely recall hearing the story of Story's altercation and pain.  *Id.*  My first encounter with Story was on September 6, 2007.  *Id.* at page 7.  Story complained of severe pain in the lower part of the back.  *Id.* at page 8.  He indicated he had spasms going down his right leg to just below the knee.  *Id.*  Story stated that he had been jumped on by the police in May and his problems had started then.  *Id.*

I do a targeted examination on my patients based on the complaint at the time of presentation.  *Plff's Ex.* 7 at page 10.  From the physical examination, I concluded that Story "did not have a significant neurologic injury at that time."  However, this "doesn't mean he might not have some irritation or something, you know, accounting for his pain.  It just says that, basically, there's nothing to suggest he's an operative candidate at this point in time."  *Id.* at page 12.  My notes indicate Story

had "sciatic stretch pain on the right, and that--the sciatic nerve runs near the soleus muscles in the back, and when you stretch those muscles by extending the leg in a sitting position, it will irritate the nerve if it's irritable." *Id.* at page 12.  Additionally, on palpation, Story had "marked pain over the lumbar musculature, in other words, the musculature of the lower back on the right, as well as tenderness over the lumber spinous processes." *Id.* at page 13.  The findings were consistent with sciatica or irritation of the sciatic nerve, which may come from degenerative disk disease or irritation of the nerve from other causes." *Id.* at page 23.

The plan at that point was to prescribe a muscle relaxer, Methycarbomal, to relieve the spasms and Ibuprofen as an anti-inflammatory. *Plff's Ex.* 7 at 16.  The medications were for ten days. *Id.* at page 18.  I also put some restrictions on Story's physical activity.  *Id.*

I next saw Story on September 11th.  *Plff's Ex.* 7 at page 18.  At this visit, I noted that Story reported having been struck across the back during an altercation with the police.  *Id.*  During his first visit, Story did not say he had been struck across the back but just said he had been jumped on.  *Id.*

My physical examination was unchanged from the prior examination.  *Plff's Ex.* 7 at 19. Story still had sciatic stretch pain.  *Id.* at page 29.  I felt that Story's condition was worsening and he was not responding as one would have expected.  *Id.* at page 27.  For this reason, I ordered an MRI. *Id.* at page 19.  The restrictions on Story's physical activities were continued.  *Id.* at page 29.

During neither visit did Story complain of injury to his shoulder, head, or arms.  *Plff's Ex.* 7 at page 36.  Further, I did not find any evidence of injuries to Story's shoulder, head, or arms.  *Id.*

As Story was in the ADC, the order for an MRI also had to be approved by Dr. Anderson in Pine Bluff.  *Plff's Ex.* 7 at page 20.  I did not see the report of the MRI until now.

-13-

The MRI showed early degenerative disk disease at L5-S1 and early bilateral facet joint arthropathy. *Plff's Ex.* 7 at page 21.   Neither of those diagnoses are consistent with an acute or sudden impact event. *Id. See also* page 22 ("The history relative from the trauma would not be consistent with the MRI findings of degenerative disk disease.").   Both are chronic ongoing conditions unrelated to trauma. *Id.* at page 38.   While sciatica can occur without degenerative disk disease, that would be a "rare bird." *Id.* at page 24.   Moreover, there were no findings on the "MRI to support the diagnosis of--or presumed diagnosis of sciatica." *Id.* at page 29.   There were "no bulging disks, no physical findings of impingement on the nerve which would result in sciatica." *Id.*

These findings did not mean Story didn't have sciatica--only that there was nothing to surgically correct. *Id.* at page 29 & 39.   In my opinion, Story would recover with conservative therapy. *Id.*

Trauma can, however, aggravate the symptoms of degenerative disk disease. *Plff's Ex.* 7 at page 25.   While it was possible for the symptoms to be aggravated by being struck with an instrument such as a flashlight on the back, I "would have a hard time going for it." *Id.* at page 26.   The nerves and structures are very deep in the musculature. *Id.*   It was far more plausible for someone who had been in an altercation or jumped on, to exhibit symptoms because of the aggravation. *Id.* at page 25-26.

The majority of the time the symptoms caused by an aggravation of degenerative disk disease last ten days to two weeks. *Plff's Ex.* 7 at page 26.   However, the symptoms can last a month or six weeks. *Id.*

I reviewed the notes taken at a nurse's visit on June 22nd. *Plff's Ex.* 7 *Scott Depo.* at page 32.   The symptoms Story was reporting would be consistent with an aggravation of degenerative disk

disease.  *Id.*   During the June 27th nurse's visit, Story was complaining of pain starting in the groin area.  *Id.*  These symptoms were not consistent with degenerative disk disease.  *Id.*  I have never seen "anyone with sciatica complain of groin pain."  *Id.* at 33.  The findings from an August 14th visit, would not be unreasonable with someone with degenerative disk disease.  *Id.* at page 34.  On September 21st, Story, complaining of back pain, was seen by a nurse.  *Id.*  The nurse noted that during the exam there were "exaggerated movements."  *Id.*  The reference to exaggerated movements was an "inside shorthand" way to say she thought his reactions were out of proportion to what one would expect.  *Id.*

I reviewed the written notes made by Dr. Jonak when he saw Story on October 9th.  *Plff's Ex.* 7 at page 34.  Dr. Jonak's finding were consistent with an aggravation of degenerative disk disease. *Id.*   The restrictions placed on Story by Dr. Jonak, no prolonged crawling, stooping, running, jumping, walking and standing, were reasonable restrictions.  *Id.* at pages 34-35.

### Dr. Stephen Tabe (by Deposition)

I am an emergency room doctor at Ouachita County Medical Center and was working in that capacity in May of 2007.  *Defendant's Exhibit* (hereinafter *Defts' Ex.*) 1 at pages 4-5.  I have no recollection of Story other than what is set forth in the medical records.  *Id.*

I was the emergency room doctor who saw Story on May 22nd.  *Deft's Ex.* 1 at page 5.  It is my practice to review the nurse's assessment of the patient and then to take in account, and record in my medical notes, the complaints voiced by patients.  *Id.* at pages 6-7.

The records from the May 22nd visit indicate Story told the nurse he had been hit on the left forearm and shoulder with a flashlight.  *Deft's Ex.* 1 at page 7.  Story's vital signs were within normal limits.  *Id.* at page 8.  Story "presented  with complaint of left elbow and shoulder pain.  That's it."

*Id.* On the physical examination, I noted the left elbow was painful to palpation but range of motion was intact. *Id.* The range of motion on the shoulder was intact. *Id.* at page 11.

There were no other positive physical findings on my examination. *Deft's Ex.* 1 at page 10. I ordered an x-ray of Story's elbow and shoulder. *Id.* at pages 10-11. The x-rays were all negative. *Id.* at page 11.

There were "[n]o focal neurological deficits." *Deft's Ex.* 1 at page 8. There are no notes about Story voicing complaints of back pain or being struck in the back. *Id.* However, in my experience, "most folks . . . never complain about any problem until the following day." *Id.*

Palpation is when you "hold it down and press it." *Id.* at page 9. The patient then responds by indicating whether it hurt. *Id.* I diagnosed a left elbow contusion, prescribed Advil, and told Story to follow-up with his regular doctor. *Id.* at pages 12 & 25.

"A contusion is based mostly on [the] chief complaint." *Deft's Ex.* 1 at page 25. It is not based on anything I saw. *Id.* I did not observe any redness or swelling. *Id.*

I next saw Story on June 4, 2007. *Deft's Ex.* 1 at page 13. When Story came in, the nurse's notes indicate he complained that he was hit in the mid to lower back with a flashlight on May 22nd. *Id.* at page 14. My notes indicate Story presented with back and left elbow pain. *Id.* Story was alert, oriented, his lungs were clear and he had no focal deficit. *Id.* Story walked without difficulty and his grip strength was equal. *Id.* I did not palpate Story's back for muscle spasms or do a straight raising test because all the other signs were negative. *Id.* at page 26.

Based on my examination, I concluded Story did not warrant further testing in the emergency room. *Deft's Ex.* 1 at page 14. Story was prescribed Ibuprofen and told to follow-up with an orthopedic doctor by making an appointment. *Id.* at pages 15-17. I made this recommendation

-16-

because Story could have a disc problem.  *Id.* at page 16.  I do not do MRI's in the emergency room unless the patient has a focal deficit.  *Id.*  If Story had needed to see an orthopedic doctor immediately, I would do the transfer in the emergency room.  *Id.*

I next saw Story on June 7th.  *Deft's Ex.* 1 at pages 17-18.  The nurse's notes indicate:  Story was complaining he had been having back pain for two weeks; he was on ibuprofen; and his vital signs looked stable.  *Id.* at page 18.  A note was also made that Story was having pain going down his leg.  *Id.* at page 28.  These symptoms could come from the sciatic nerve.  *Id.*

On physical examination, I noted Story's grip strength was equal bilaterally, there were no focal deficits, the deep tendon reflex was okay, and he walked without difficulty.  *Deft's Ex.* 1 at page 18.  Story did not complain of his elbow hurting this time.  *Id.* at page 21.

Story stated that there had been no new trauma.  *Deft's Ex.* 1 at page 18.  However, there is a notation from the ambulance transfer that Story had fallen inside the detention center on that day.  *Id.* at pages 19-21.  If there had been focal deficit, it would have meant Story had a serious injury like a nerve or spinal cord injury.  *Id.* at page 19.

Based on my physical examination, I ordered no additional tests or treatment.  *Deft's Ex.* 1 at page 21.  Story did, however, receive a pain shot while in the emergency room.  *Id.* at page 27.  I continued Story on Ibuprofen and recommended Story see a specialist who would be able to "make a complete diagnostic work-up like an MRI."  *Id.* at pages 21-22.

The diagnostic impression from the MRI done on Story in September indicates Story had early degenerative disc disease at L5-S1 and early bilateral facet atrophy at L4-L5.  *Deft's Ex.* 1 at pages 30-31.  In my opinion, both conditions were mostly arthritis.  *Id.*

-17-

The MRI was done on September 27, 2007.  *Deft's Ex.* 1 at page 29.  It appeared Story's condition had worsened between June and September.  *Id.* at page 32.  I base this opinion on the fact that Story had presented with new complaints including his leg going numb.  *Id.* at page 32.

### Nurse Practitioner Connie Hubbard (by Deposition)

Although I have a medical doctorate degree, I have not done a residency so I practice as an advanced practice nurse practitioner under my graduate degree in nursing.  *Plff's Ex.* 6 at page 5.  I have worked clinically for about thirty years.  *Id.*  I worked with a neurologist for fifteen to twenty years.  *Id.* at page 15.  For the past five years, as part of my practice, I see inmates at the Department of Correction.  *Id.* at page 6.  Without looking at the records, I have no independent recollection of seeing Story.  *Id.*

The records indicate, I first saw Story on June 23, 2007.  *Plff's Ex.* 6 at page 6.  He was complaining of back pain.  *Id.*  He attributed the low back pain to an assault that occurred in May.  *Id.* at page 7.  I did a traditional examination.  *Id.*  I checked his reflexes, his muscle strength, and did a general neurological exam to see if there was any indication of compression symptoms with radicular symptoms into the extremities.  *Id.*  I found no major deficits.  *Id.*  Upon palpation of the lower back on the right side, he complained of some radiation of discomfort into the leg.  *Id.*  I concluded he possibly had some pressure on a nerve to cause this sensation into his leg.  *Id.*

The sciatic nerve goes from the upper part of the buttocks and into the posterior portion of the leg.  *Pllf's Ex.* 6 at page 8.  The sciatic nerve can get irritated and create the same sensation in the leg.  *Id.*  At that time, I couldn't determine if the sensation was caused by sciatica.  *Id.*  I treated him with traditional muscle relaxer, anti-inflammatory and carbamazepine which can be used for neuritic

sort of pain.  *Id.*  I ordered an x-ray to determine if there were any sort of fractures or displacements. *Id.* at page 9.  I also put him on restrictions for a couple of weeks.  *Id.* at page 8.

I next saw Story on July 16th.  *Plff's Ex.* 6 at page 9.  This was a follow-up visit and we went over his x-ray report which indicated there were no fractures present and good alignment of the vertebral bodies.  *Id.*  He did not have any radicular symptoms so it looked like he had improved. *Id.*  I gave him back exercises to do, told him to increase his activity, continued him on Ibuprofen, and told his to finish his prescriptions.  *Id.* at pages 9-10.

On August 4th, I saw Story again.  *Plff's Ex.* 6 at page 10.  He was complaining of pain in his back and some radicular symptoms into his posterior thigh.  *Id.* at page 11.  I did a physical examination.  *Id.*  I resumed the muscle relaxers, gave him an steroid injection, and prescribed a short course of oral steroids.  *Id.*  I also put him on restrictions for a week.  *Id.*

I saw Story next on August 20th.  *Plff's Ex.* 6 at page 11.  He was continuing to complain of the same sort of pain.  *Id.*  I did a physical examination and there was no indication of any radicular symptoms.  *Id.*  I gave him activity restrictions and to give him another opinion I asked him to see Dr. Scott.  *Id.* at pages 11 & 17.  I do not believe I ever saw Story again after this.  *Id.* at page 12.

With respect to the subjective component of my chart, I am generally typing while the patient is talking to me.  *Plff's Ex.* 6 at page 12.  If the patient tells me something in specific street terminology, and its relevant, I incorporate that into the history.  *Id.*  If an inmate told he was beaten with a flashlight and that caused the problem, I would not usually put that in my notes.  *Id.* at pages 13-14.  I just put in there what he is complaining of.  *Id.* at page 14.

In my treatment of Story, I did not see any injuries that could have been caused by being struck with a flashlight.  *Plff's Ex.* 6 at page 14.  I probably didn't see him until a month after he got

-19-

to the ADC so at that time there was nothing acute to be seen on him. *Id.* If he had complained about injuries to his shoulder, head, or arms, I would have typed that into my notes. *Id.* at page 15.

I was not aware when I saw Story that he had degenerative disc disease. *Plff's Ex.* 6 at page 16. I did not have the records from his visits to the Ouachita County Medical Center's emergency department. *Id.* at page 17. I never saw the MRI. *Id.* Story's symptoms were consistent with the findings of the MRI. *Id.* at page 18. Any kind of falls, trauma, or even just sleeping wrong can cause an aggravation of degenerative disc disease. *Id.*

My diagnosis was just lower back pain with intermittent radicular symptoms. *Plff's Ex.* 6 at page 19. The MRI report goes more along with low back pain. *Id.* It does not mention the sciatic nerve. *Id.*

## II.  Discussion

On May 22nd, Story was in convicted status being held for the ADC. "[T]he Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences." *Wilson v. Spain*, 209 F.3d 713 (8th Cir. 2000)(*citing Whitley v. Albers*, 475 U.S. 312, 318-322 (1986)). "The Eighth Amendment protects inmates from the unnecessary and wanton infliction of pain by correctional officers regardless of whether an inmate suffers serious injury as a result." *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002)(citations omitted).

The Supreme Court has held that when "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident.  Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Hudson v.*

*McMillian*, 503 U.S. 1, 9 (1992). *See also Wilkins v. Gaddy*, ___ U.S. ___, 130 S. Ct. 1175, 1176 (2010)(Dismissal of case on determination there were *de minimis* injuries was in error. The case must be decided on the "nature of the force rather than the extent of the injury.").

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (*quoting Hudson*, 503 U.S. at 6-7). To make this determination, the Court is to consider, among other things, the following factors: "the need for the application of physical force; the relationship between the need for physical force and the amount of force applied; and the extent of injury suffered by the inmate." *Jones*, 207 F.3d at 495 (citations omitted).

Keeping these principles in mind, I turn to an examination of the facts of this case. Story testified that the attack against him was completely unprovoked. He indicated when Norwood arrived he was trying to put the milk crate upright and to put the cooler back up on it. Story maintained he had turned and was walking away from the door when Norwood came in. Story asserted that Norwood immediately started hitting him with the flashlight. Altogether, Story maintains he was hit four times. The first blow was on his left forearm in the elbow area. Story testified that he was then hit on the top part of the left shoulder, the middle part of his back, and the upper part of his back. He testified there was no pushing involved just the four blows with the flashlight. He asserted that he did not refuse to obey any orders and was not resisting in anyway.

Story's testimony is substantiated in part by the testimony of inmates Gregory Tooks, Roy Malcolm, Jr., and Ray Brewer. Tooks testified that Norwood came up and told Story to back away from the gate. Tooks indicates Norwood then hit Story on the arm and back. Malcolm indicated that

as Norwood entered 3-front he hit Story three times with a long police flashlight.  Malcolm testified it looked like Story was doing nothing at the time.  Brewer testified that when Norwood came up he yelled for everyone to get on the wall.  When Norwood gave the order, Brewer asserts Story headed towards the bar.  As Story tried to retreat, Brewer testified Norwood pushed Story up against the bars.  Brewer saw Norwood strike Story with the flashlight one time.

Tooks, Malcolm, and Brewer all testified they did not observed any injuries on Story.[2]  All three testified the pod was being flooded and the inmates were being loud.  Brewer indicated he saw lights that were broken out.  Malcolm testified there was a riot going on.

Gill testified that he saw Story swinging a water jug and attempting to break lights out.  Gill stated that before they entered the pod Norwood ordered the inmates to get to the wall.  When they entered, Gill testified Norwood was met by Story who refused to go to the wall.  Norwood then pushed Story to the wall.

Norwood testified he was informed by Gill that the inmates were trashing the place.  Norwood was told there were broken lights, water, and trash everywhere.  When he arrived on the third floor, Norwood testified he "caught" Story in the act of holding the milk crate in his hand, tossing it up, and trying to hit the lights.

Norwood gave Story two orders to grab the wall and when he did not Norwood pushed him, using both hands, a few steps.  The flashlight was in Norwood's hand at the time.  When Story turned back towards Norwood, he pushed Story a second time very hard.

---

[2]Tooks and Malcolm had at an earlier stage in these proceedings provided Story with affidavits in which they indicated they had seen Story was injured.  Their testimony at the hearing contradicted their earlier affidavits.

-22-

I believe the evidence establishes that the inmates were flooding the pod, breaking lights, and being noisy.  It is undisputed that Norwood had a metal flashlight in his hand when he entered the pod.  It is also undisputed that Norwood used some amount of force against Story.  I also believe the testimony of Gill, Norwood, and Brewer establish that an order was given for the inmates to get on the wall.  When Norwood entered the pod, Story was not against the wall.  Given the situation he was faced with, it was reasonable for Norwood to utilize some amount of force in an effort to ensure his own safety, the safety of others, and to regain control of the facility.

In Whitley, 475 U.S. at 319-20, the Supreme Court stated:

> The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes  was unreasonable, and hence unnecessary in the strict sense.  [Rather, it] is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.

I find that Story has failed to prove by a preponderance of the evidence that Norwood repeatedly hit or struck him with the flashlight.  Instead, I find the credible evidence supports the conclusion that Norwood, with the flashlight in hand, twice shoved Story to the bars.  While the flashlight undoubtedly came into contact with Story, I find credible the testimony of Norwood and Gill that the only force used was to push Story to the wall.

Additionally, while the extent of the injury is only one factor to be considered, I believe that if Story was forcefully struck four times with a heavy metal flashlight he would have sustained at least some noticeable injuries.  The medical records do not suggest there was any swelling, redness, abrasions, or contusions to any area of Story's shoulder or back.  Although there was a diagnosis of a left elbow contusion, this could easily have occurred when Story was being pushed to the bars.

-23-

Further, the nature of the injury is not suggestive of the nature or amount of force Story maintains was used.

Under the circumstances, I do not believe Norwood, in applying force, acted solely because Story was not complying with his orders.  *See Treats v. Morgan*, 308 F.3d 868, 875 (8th Cir. 2002)(force may be justified to make an inmate comply with a lawful order only if the inmate's noncompliance poses a threat to other persons or to prison security); *Hickey v. Reeder*, 12 F.3d 754 (8th Cir. 1993) (correctional officers do not have a blank check to use force whenever a prisoner is being difficult).  Instead, I conclude Norwood reasonably believed that a threat to officer safety existed as well as a threat to the order and control of the facility.  Certainly, I cannot say that Story has established, by a preponderance of the evidence, that Norwood acted wantonly or maliciously. Norwood is therefore entitled to judgment in his favor.

### III.  Conclusion

I therefore recommend that judgment be entered in favor of the Defendant and this case be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **26th day of July 2010.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE